**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STEVEN JOSEPH KEENAN**, | ) | CASE NO. |
| 631 Treeside Drive | ) | |
| Akron, OH 44313, | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **AKRON PUBLIC SCHOOLS,** | ) | |
| 10 N. Main Street | ) | |
| Akron, OH 44308, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **THE BOARD OF EDUCATION OF THE** | ) | **COMPLAINT FOR DAMAGES** |
| **AKRON CITY SCHOOL DISTRICT,** | ) | |
| 10 N. Main Street | ) | **(Jury Demand Endorsed Hereon)** |
| Akron, OH 44308, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **MICHAEL ROBINSON,** | ) | |
| **IN HIS INDIVIDUAL AND FORMER** | ) | |
| **OFFICIAL CAPACITY AS THE** | ) | |
| **SUPERINTENDENT OF THE AKRON** | ) | |
| **PUBLIC SCHOOLS,** | ) | |
| 10 N. Main Street | ) | |
| Akron, OH 44308, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **MARY B. OUTLEY,** | ) | |
| **IN HER INDIVIDUAL AND OFFICIAL** | ) | |
| **CAPACITY AS THE SUPERINTENDENT** | ) | |
| **OF THE AKRON PUBLIC SCHOOLS**, | ) | |
| 10 N. Main Street | ) | |
| Akron, OH 44308, | ) | |
| | ) | |
| -and- | ) | |

1

**DIANA AUTRY,**                                )
**IN HER INDIVIDUAL AND FORMER**               )
**OFFICIAL CAPACITY AS THE BOARD**             )
**OF EDUCATION PRESIDENT OF THE**              )
**AKRON PUBLIC SCHOOLS,**                       )
10 N. Main Street                               )
Akron, OH 44308,                                )
                                                )
-and-                                           )
                                                )
**BARBARA A. SYKES,**                          )
**IN HER INDIVIDUAL AND OFFICIAL**             )
**CAPACITY AS THE BOARD OF**                   )
**EDUCATION PRESIDENT OF THE**                 )
**AKRON PUBLIC SCHOOLS,**                       )
10 N. Main Street                               )
Akron, OH 44308,                                )
                                                )
-and-                                           )
                                                )
**RENE MOLENAUR,**                             )
**IN HER INDIVIDUAL AND OFFICIAL**             )
**CAPACITY AS THE BOARD OF**                   )
**EDUCATION VICE PRESIDENT OF THE**            )
**AKRON PUBLIC SCHOOLS,**                       )
10 N. Main Street                               )
Akron, OH 44308,                                )
                                                )
-and-                                           )
                                                )
**CARLA JACKSON,**                             )
**IN HER INDIVIDUAL AND FORMER**               )
**OFFICIAL CAPACITY AS A BOARD OF**            )
**EDUCATION MEMBER OF THE**                    )
**AKRON PUBLIC SCHOOLS,**                       )
10 N. Main Street                               )
Akron, OH 44308,                                )
                                                )
-and-                                           )
                                                )
                                                )
                                                )
                                                )

2

**BRUCE ALEXANDER,**                           )
**IN HIS INDIVIDUAL AND FORMER**               )
**OFFICIAL CAPACITY AS A BOARD OF**            )
**EDUCATION MEMBER OF THE**                    )
**AKRON PUBLIC SCHOOLS,**                      )
10 N. Main Street                              )
Akron, OH 44308,                               )
                                               )
-and-                                          )
                                               )
**SUMMER L. HALL,**                            )
**IN HER INDIVIDUAL AND OFFICIAL**             )
**CAPACITY AS A BOARD OF**                     )
**EDUCATION MEMBER OF THE**                    )
**AKRON PUBLIC SCHOOLS,**                      )
10 N. Main Street                              )
Akron, OH 44308,                               )
                                               )
-and-                                          )
                                               )
**GREGORY HARRISON,**                          )
**IN HIS INDIVIDUAL AND OFFICIAL**             )
**CAPACITY AS A BOARD OF**                     )
**EDUCATION MEMBER OF THE**                    )
**AKRON PUBLIC SCHOOLS,**                      )
10 N. Main Street                              )
Akron, OH 44308,                               )
                                               )
-and-                                          )
                                               )
**NATHAN JAROSZ,**                             )
**IN HIS INDIVIDUAL AND OFFICIAL**             )
**CAPACITY AS A BOARD OF**                     )
**EDUCATION MEMBER OF THE**                    )
**AKRON PUBLIC SCHOOLS,**                      )
10 N. Main Street                              )
Akron, OH 44308,                               )
                                               )
-and-                                          )
                                               )
                                               )
                                               )
                                               )

3

**KARMAYA KELLY,** )
**IN HER INDIVIDUAL AND OFFICIAL** )
**CAPACITY AS A BOARD OF** )
**EDUCATION MEMBER OF THE** )
**AKRON PUBLIC SCHOOLS,** )
10 N. Main Street )
Akron, OH 44308, )
 )
-and- )
 )
**PHILLIP MONTGOMERY,** )
**IN HIS INDIVIDUAL AND OFFICIAL** )
**CAPACITY AS A BOARD OF** )
**EDUCATION MEMBER OF THE** )
**AKRON PUBLIC SCHOOLS,** )
10 N. Main Street )
Akron, OH 44308, )
 )
-and- )
 )
**ANGELA CARTER,** )
**IN HER INDIVIDUAL AND OFFICIAL** )
**CAPACITY AS THE CHIEF OF STAFF** )
**OF THE AKRON PUBLIC SCHOOLS,** )
10 N. Main Street )
Akron, OH 44308, )
 )
-and- )
 )
**STEPHEN THOMPSON,** )
**IN HIS INDIVIDUAL AND FORMER** )
**OFFICIAL CAPACITY AS THE** )
**TREASURER OF THE AKRON PUBLIC** )
**SCHOOLS,** )
10 N. Main Street )
Akron, OH 44308, )
 )
Defendants. )

Now comes Plaintiff, Steven Joseph Keenan ("Keenan"), by and through undersigned counsel, for his Complaint against Defendants, states as follows:

4

## I.     <u>JURISDICTION</u>

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, in that this is a civil action arising under the Family and Medical Leave Act ("FMLA"), as codified under 29 U.S.C. § 2615, *et seq.*, and Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq.*

2.     This Court has supplemental jurisdiction over plaintiff's related claims arising under Ohio state law pursuant to 28 U.S.C. §1367(a) because the Ohio state law claims, including breach of contract, bad faith, and defamation, is so closely related to the transactions of his federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

3.     Keenan is a resident of the State of Ohio.

4.     The actions described herein that relate to the incidents that brought rise to Keenan's cause of action occurred in the County of Summit, in the State of Ohio.

5.     Defendant, Akron Public Schools ("APS"), is a political subdivision of the County of Summit in the State of Ohio, with its principal office located in the City of Akron, County of Summit, State of Ohio.

6.     Defendant, the Board of Education of the Akron City School District (the "Board"), is the governing body of APS.

7.     Defendant Michael Robinson ("Robinson") was the former superintendent of APS when Keenan's causes of action first arose in 2024 and was a resident of the County of Summit at all relevant times.

8. Defendant Mary B. Outley ("Outley") is the current superintendent of APS, the successor to Robinson in this position from 2025 to date, and was a resident of the County of Summit at all relevant times.

9. Defendant Diana Autry ("Autry") was the former president of the Board when Keenan's causes of action first arose in 2024 and was a resident of the County of Summit at all relevant times.

10. Defendant Barbara A. Sykes ("Sykes") is the current president of the Board, upon information and belief, the successor to Autry in this position, and was a resident of the County of Summit at all relevant times.

11. Defendant Rene Molenaur ("Molenaur") is the vice-president of the Board and was a resident of the County of Summit at all relevant times.

12. Defendant Carla Jackson ("Jackson") was a former member of the Board and was a resident of the County of Summit at all relevant times.

13. Defendant Bruce Alexander ("Alexander") was a former member of the Board and was a resident of the County of Summit at all relevant times

14. Defendant Summer L. Hall ("Hall") is a member of the Board and was a resident of the County of Summit at all relevant times.

15. Defendant Gregory Harrison ("Harrison") is a member of the Board and was a resident of the County of Summit at all relevant times.

16. Defendant Nathan Jarosz ("Jarosz") is a member of the Board and was a resident of the County of Summit at all relevant times.

17. Defendant Karmaya Kelly ("Kelly") is a member of the Board and was a resident of the County of Summit at all relevant times.

18. Defendant Phillip Montgomery ("Montgomery") is a member of the Board and was a resident of the County of Summit at all relevant times.

19. Defendant Angela Carter ("Carter") is the chief of staff for APS and the Board and was a resident of the County of Summit at all relevant times.

20. Defendant Stephen Thompson ("Thompson") was the former treasurer of APS and was a resident of the County of Summit at all relevant times.

21. Defendants APS, the Board, Robinson, Outley, Autry, Sykes, Molenaur, Hall, Harrison, Jarosz, Kelly, Montgomery, and Carter shall collectively be known, hereinafter, as "Defendants".

## II.   VENUE

22. Paragraphs 1 – 21 are incorporated as if fully restated herein.

23. Venue is proper and appropriate in this district, under 28 U.S.C. § 1391(b), as the entire, and/or substantial part of the events for FLMA, Title VII, breach of contract, and defamation actions occurred in the County of Summit, in the State of Ohio.

## III.   FACTS

24. Paragraphs 1 – 23 are incorporated as if fully restated herein.

25. Keenan has served APS since March 6, 2017.

26. Keenan started with APS as a small engine repairer and was promoted to grounds foreman in July of 2021.

27. On March 28, 2024, APS and the Board appointed Keenan as Director of Facilities Services under a one-year contract ("Contract").

28. After Keenan's promotion to Director, his senior female staff members and supervisors repeatedly told him that he was "too young" and "not experienced enough".

7

29.     The Contract was renewed on May 30, 2025, for one more year with a salary of $124,278.28.

30.     Throughout Keenan's employment, his performance evaluations were consistently rated "Very Good" to "Outstanding".

31.     Keenan had no prior formal discipline and no prior outside misconduct investigations.

32.     On or around November 22, 2024, Keenan was approved for an FMLA leave to care for his spouse after a major surgery.

33.     During his FMLA leave, APS, Robinson, and/or the rest of the Board informed Keenan that his position was being restructured, and that his responsibility, supervision of employees, and even his office was to be reassigned.

34.     On or around November 23, 2024, Keenan wrote a complaint to Autry regarding his position being restructured and stating that the restructuring was unstainable.

35.     On or around November 25, 2024, two days after Keenan submitted his complaint to Autry, Defendants cut off his access to district systems, including email and financial portals, without notice or explanation.

36.     Robinson had stated to Keenan that the restructuring was only temporary while Keenan was on his FMLA leave.

37.     On or around November 27, 2024, during his leave, the Board, Autry, and/or Robinson, through Yamini Adkins, APS's Executive Director of Human Capital, sent Keenan a written notice that he will not be permitted to access his work computer or other equipment and was directed to not perform any work during the leave.

8

38.     On or around December 9, 2024, Keenan's FMLA leave was taken intermittently, and he would return to his regular office for work partially during his FMLA leave.

39.     On or around December 9, 2024, Robinson informed Keenan that he no longer had a physical office, and he was reassigned to a cubical of the central administrative building.

40.     On or around December 9, 2024, Robinson informed Keenan that his responsibility relating to managing APS's facilities services division, and the supervision over 300 of APS's employees of said division, was reassigned to Carter and Robinson.

41.     Robinson reduced a significant portion of Keenan's contractual duties.

42.     On or around December 15, 2024, still during Keenan's intermittent FMLA leave, Harrison called Keenan to ask for a copy of the complaint Keenan sent to Autry, claiming that none of the Board had seen the complaint.

43.     Harrison's contact with Keenan during his FMLA leave was coercive, hostile, and threatening in nature.

44.     APS employed a third party, the law firm of Brennan Manna Diamond, to conduct an investigation into Robinson's retaliation, hostility, and threats towards employees.

45.     APS acknowledged that, by spring 2025, the third-party investigation was completed and that the report includes a finding that Robinson retaliated against Keenan for sending the November 2024 letter to the Board.

46.     On or around April 15, 2025, Robinson was placed on administrative leave for retaliation, hostility, and threats towards employees.

47.     On or around April 15, 2025, Outley became the interim superintendent in place of Robinson.

9

48.     Robinson resigned on April 28, 2025, and Outley became fulltime superintendent that same day.

49.     When Outley became interim superintendent, she had the authority to restore Keenan's pre-FMLA leave responsibility, access, and physical office that Robinson stripped away.

50.     Even after Robinson resigned, Outley and the Board still did not restore Keenan's duties, access, authority, and office.

51.     On May 15, 2025, because his duties, access, authority, and office were not restored, Keenan filed an Ohio Civil Rights Commission ("OCRC") charge, case no.: AKR73(014729)05152025, which was subsequently transferred to the U.S. Equal Employment Opportunity Commission ("EEOC"), as charge no.: 22A-2025-03834 ("May Charge"). See attached hereto as Exhibit "1".

52.     Even after Robinson resigned, APS, Outley, and the Board never restored Keenan's duties, access, or authority before he filed his OCRC Charge.

53.     During the EEOC's and OCRC's investigation into the May Charge, Outley, Carter, Thompson, and the Board instituted a parallel investigation into Keenan and the Baker trade-in matter in an attempt to circumvent any findings of the EEOC or OCRC and to terminate Keenan.

54.     Baker Vehicle Systems ("Baker") and APS engaged in arms-length transactions for APS to trade in its lawnmowers to Baker and for Baker to give APS credit for its next purchase of equipment from Baker.

55.     Around March 2025, APS's grounds foreman, Bryan Ressler, and mechanic, Glenn Boone, initiated and compiled a trade-in list of APS's lawnmowers for Baker to review.

56.     The March 2025 trade-in list and Baker's given value for them was approved by Debra Foulk, the executive director of APS's Office of Business Affairs.

57. March 2025 trade-in list of APS's used lawnmowers to Baker was an arms-length transaction.

58. Multiple APS's employees, including Keenan, receive a Baker standard family and friend's discount rate to purchase used equipment.

59. Keenan purchased used lawnmowers from Baker to then repair and sell.

60. On or around May 19, 2025, at a meeting with APS's then-treasurer, Thompson, and its human capital coordinator, Tod Wammes ("Wammes"), Carter presented allegations that the March 2025 lawnmowers traded from APS to Baker were appearing on Facebook Marketplaces, including on Keenan's Facebook Marketplace.

61. Keenan was called into questioning by Defendants within days after Carter's allegations on May 19, 2025.

62. On June 6, 2025, Defendants and/or Outley placed Mr. Keenan on paid administrative leave.

63. On June 6, 2025, Mr. Keenan filed a second OCRC charge, case no.: AKR73(015357)06062025, which was subsequently transferred to the EEOC, as charge no.: 22A-2025-04061 ("June Charge"). See attached hereto as Exhibit "2".

64. APS still did not restore Keenan's authority even after he filed his June Charge.

65. Defendants proceeded with outside investigation into the trade-in with Baker.

66. On or around September 8, 2025, Defendants issued Keenan a pre-disciplinary notice regarding the Baker trade-in.

67. Sykes threatened, and/or implied, to involve the police, prosecutor's office, IRS, and the state auditor.

68.     On or around September 11, 2025, Keenan submitted a reply to Board's allegation in their pre-disciplinary notice that he faced age and sex discrimination from when he was appointed as director and this discrimination is ongoing. A copy of the reply is attached hereto as Exhibit "3".

69.     Defendants then threatened and/or implied to Keenan that criminal prosecution may be taken against him for the Baker trade-in matter.

70.     Defendants threaten and/or implied that they will bring criminal prosecution against Keenan if he did not resign.

71.     Keenan subsequently resigned on or around September 2025.

72.     Defendants' decision to quickly escalate the Baker trade-in matter was selective and influenced by Keenan's May Charge, which was a protected activity.

73.     Defendants took no action to restore Keenan's duties, authority, reporting structure, or workspace after the earlier third-party finding that retaliation had occurred.

74.     Defendants made several false statements to the media that Keenan took "advantage of the system".

75.     Keenan had several job prospects prior to these statements and had gone through several rounds of interviews prior to Defendants retaliatory investigation.

76.     Upon belief, Keenan was denied those job opportunities as a result of Defendants' false statements.

## IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

77.     Paragraphs 1 – 76 are incorporated as if fully restated herein.

78.     On May 15, 2025, Keenan filed his May Charge with the OCRC and EEOC, and Defendants responded to the charge.

79.     On June 6, 2025, Keenan filed his June Charge with the OCRC and EEOC, and Defendants responded to the charge.

80.     On April 14, 2026, more than 60 days since Keenan filed both his May and June Charges, the EEOC issued him the Notices of Right to Sue on both charges. See attached hereto as Exhibits "4" and "5".

81.     This Complaint is filed within 90 days of the Notices of Right to Sue.

82.     Keenan has satisfied the conditions of ORC § 4112.052 to bring a civil action for unlawful discriminatory practice relating to employment after filing his May and June Charges.

83.     Keenan has fully complied with all prerequisites to jurisdiction in this Court under the Title VII and the OCRC.

## V.     COUNT ONE: FMLA VIOLATION

84.     Paragraphs 1 – 83 are incorporated as if fully restated herein.

85.     The FMLA prohibits an employer from interfering with, restraining, or denying the exercise of FMLA rights. 29 U.S.C. § 2615(a)(1).

86.     Upon return from FMLA leave, an employee is entitled to restoration to the same position held when leave began or to an equivalent position with equivalent terms and conditions. 29 U.S.C. § 2614(a)(1). An employer interferes with FMLA rights when it uses the employee's leave as the basis for stripping job authority and restructuring the employee's position during the protected absence

87.     Keenan exercised his FMLA rights and applied to APS for an FMLA leave to care for his spouse after a major surgery.

88.     After learning of Keenan's exercise of his FMLA rights, Robinson reduced Keenan's position and authority.

13

89. Keenan suffered an adverse employment action when his position was restructured and reduced to a figurehead with no authority during his FMLA leave and it was never restored even after his return.

90. After Robinson was placed on administrative leave for retaliating against Keenan, the Board and Outley still failed to restore Keenan's authority, access, and office.

91. The Board, Robinson, and Outley restructured and reduced Keenan's contracted position, and kept it reduced, permanently because Keenan exercised his FMLA right to take leave to care for his spouse.

92. Keenan's FMLA leave was the "motivating factor" in Robinson's decision to demote and reduced his position and authority, even if there are legitimate non-discriminatory reasons that also motivated these actions.

93. Robinson's restructuring and reduction of Keenan's position were adverse employment actions and events, that the Board and Outley knowingly caused and/or permitted, cumulating and resulting from Keenan's FMLA leave.

94. The Board's, Robinson's, and Outley's adverse employment actions against Keenan were made in retaliation to Keenan's exercising his FMLA rights.

95. Keenan resigned around September 2025 under duress.

96. Keenan was constructively terminated because of the Board's, Robinson's, and Outley's adverse employment actions.

97. As a result of the Board's, Robinson's, and Outley's unlawful actions, Keenan has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

14

98.     Keenan is entitled to reinstatement and an award of back pay, front pay, and benefits, compensatory damages, liquidated damages, attorneys' fees, cost of litigation, plus interest, in an amount to be calculated at trial and in an amount of no less than $25,000, and all other appropriate damages, remedies, and other relief under 29 U.S.C. § 2617.

## VI.    COUNT TWO: FMLA VIOLATION - RETALIATION

99.     Paragraphs 1 – 98 are incorporated as if fully restated herein.

100.    When Keenan wrote a complaint to Autry and filed his May Charge and June Charge about his reduced position, APS instigated an investigation into the Baker trade-in matter as retaliation.

101.    The Baker trade-in matter involved multiple APS employees.

102.    Upon information and belief, there were one or more other APS employees that bought APS's used lawnmowers from Baker and then sold.

103.    Upon information and belief, no other APS employees were terminated or were asked to resign due to the Baker trade-in matter.

104.    Keenan's FMLA leave and filing complaints of the FMLA violations were the "motivating factor" in the Board's and Outley's investigation and their decision to keep Keenan's position and authority reduced, even if there are legitimate non-discriminatory reasons that also motivated these actions.

105.    After Keenan filed his May Charge for Robinson's FMLA violations, the Board and Outley still did not restore Keenan's position and placed him on administrative leave for the Baker trade-in matter.

106.    Keenan filed his June Charge for his administrative leave.

15

107. The Board and Outley then threatened and/or implied civil litigation and/or criminal prosecution against Keenan if he did not resign.

108. Keenan resigned around September 2025 under duress.

109. Keenan was constructively terminated because the Board and Outley led Keenan to believe that there would be civil litigation and/or criminal prosecution if he did not.

110. Robinson's restructuring of Keenan's position, the Board's Baker trade-in investigation, the Board's decision to place Keenan on administrative leave, and the Board's threats for civil litigation and/or criminal prosecution, leading to Keenan's constructive termination, were all adverse employment actions and events, that the Board and Outley knowingly caused, cumulating and resulting from Keenan's FMLA leave, May Charge, and the November 2024 complaint to Autry about Defendants' FMLA violation.

111. Defendants' adverse employment actions against Keenan were made in retaliation to Keenan's exercising his FMLA rights, and his rights to report claims of FMLA violations.

112. As a result of Defendants' unlawful actions, Keenan has suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

113. Keenan is entitled to reinstatement and an award of back pay, front pay, and benefits, compensatory damages, liquidated damages, attorneys' fees, cost of litigation, plus interest, in an amount to be calculated at trial and in an amount of no less than $25,000, and all other appropriate damages, remedies, and other relief under 29 U.S.C. § 2617.

## VII.  COUNT THREE: TITLE VII VIOLATION – SEX DISCRIMINATION

114. Paragraphs 1 – 113 are incorporated as if fully restated herein.

16

115. At all relevant times, Keenan was an "employee" of APS, as that term is defined by Title VII, 42 U.S.C. § 2000e, *et seq*.

116. At all relevant times, APS was an "employer" as that term is defined by Title VII, 42 U.S.C. § 2000e, *et seq*.

117. Defendants violated Keenan's rights under Title VII by subjecting him to disparate discipline because of his sex as a male.

118. Defendants, through their female supervisors and senior employees, repeatedly told Keenan that he was "too young" and "not experienced enough."

119. Robinson assigned Keenan's duties and authority to Carter, a female employee, while Keenan was on FMLA leave.

120. Robinson resigned after being found to be retaliating against Keenan when he reduced Keenan's duties and authority.

121. When Outley, female, was appointed as successor to Robinson as superintendent, she did not restore Keenan's duties, access, authority, and office.

122. Majority of APS' leadership roles, such as directors, chief, superintendent, and assistant superintendent are females.

123. The Board and Outley violated Keenan's rights under Title VII by failing to restore his duties, access, authority, and office after Robinson retaliated against him because of Keenan's sex.

124. Upon information and belief, Keenan's sex was a "motivating factor" in Defendants' decision to not restore his duties, access, authority, and office after Robinson reduced them in retaliation.

125. Keenan resigned under duress and was constructively terminated as a result of Defendants' discriminatory actions.

126. Keenan's sex was a "motivating factor" in Defendants' decision, even if there are legitimate non-discriminatory reasons that also motivated these actions.

127. Defendants acted with malice or with reckless indifference to the federally protected rights of Keenan.

128. As a result of Defendants' unlawful actions, Keenan suffered lost compensation and other benefits of employment, emotional distress, inconvenience, loss of income, humiliation, and other indignities.

129. Keenan is entitled to an award of back pay, front pay, and benefits, compensatory damages, attorneys' fees, and all other appropriate damages, remedies, and other relief under Title VII and all federal statutes providing remedies for violations of Title VII.

## VIII. COUNT FOUR: TITLE VII RETALIATION

130. Paragraphs 1 – 129 are incorporated as if fully restated herein.

131. At all relevant times, Keenan was an "employee" of APS, as that term is defined by Title VII, 42 U.S.C. § 2000e, *et seq.*

132. At all relevant times, APS was an "employer" as that term is defined by Title VII, 42 U.S.C. § 2000e, *et seq.*

133. During his employment, Keenan engaged in statutorily protected activity by, among other things, complaining of violations of FMLA and Title VII, including but not limited to, his November complaint to Autry, and his May Charge and June Charge.

134. The Board, Outley, Thompson, and Carter subjected Keenan to retaliation because he opposed, objected to, and complained against Defendants' FMLA violations.

135. Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] *has made a charge, testified, assisted, or participated in any manner in an investigation*, proceeding, or hearing under [Title VII]." (Emphasis added). 42 U.S.C. § 2000e–3(a).

136. Defendants may argue that Keenan's November 2024 complaint to Autry, or his May Charge, was not protected because they do not allege discrimination based on race, sex, disability, age, or another Title VII or Ohio R.C. Chapter 4112 classification.

137. Keenan had notified Defendants that he was suffering from workplace discrimination based on his sex in his reply to the Board. See Exhibit 3.

138. Title VII protects an employee from adverse employment actions once an employee made a charge or is part of an investigation under Title VII.

139. Robinson's restructuring of Keenan's position, the Board's Baker trade-in investigation, the Board's decision to place Keenan on administrative leave, and the Board's threats for civil litigation and/or criminal prosecution, leading to Keenan's constructive termination, were all adverse employment actions and events, that the Board knowingly caused, cumulating and resulting from Keenan's FMLA leave, May Charge, and the November 2024 complaint to Autry about Defendants' FMLA violation.

140. Once the May Charge was filed with the EEOC and OCRC, Keenan was part of an investigation under Title VII, regardless of whether it was based on protected class discrimination.

141. During the EEOC's and OCRC's investigation into the May Charge, the Board, Carter, Thompson, and Outley instituted a parallel investigation into Keenan and the Baker trade-in matter in the attempt to circumvent any findings of the EEOC or OCRC to terminate Keenan.

142. The Board lacked any legitimate justification for subjecting Keenan to the adverse employment actions complained about above, and/or any such veiled legitimate justifications are mere pretext for retaliation.

143. The above-pled actions of the Board constitute retaliation in violation of Title VII of the Civil Rights Act of 1964.

144. The actions of the Board and Outley in subjecting Keenan to the adverse actions complained of above were willful, deliberate, and intended to cause Keenan harm, and/or were committed with reckless disregard for the harm caused to Keenan and were in derogation of Keenan federally protected rights.

145. As a direct and proximate result of Defendants' violations of Title VII, Keenan has suffered damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities.

146. As a result of the above-pled violations of Title VII, Keenan is entitled to recover lost wages and economic benefits of his employment, compensatory damages for emotional distress, and punitive damages, in an amount to be calculated at trial and in an amount of no less than $25,000, as well as back pay, front pay, and other equitable relief, and all other legal and equitable relief provided for by Title VII and all statutes providing for relief for violations of Title VII.

## IX. COUNT FIVE: BREACH OF CONTRACT

147. Paragraphs 1 – 146 are incorporated as if fully restated herein.

148. Keenan and APS entered into a valid one-year employment contract, the Contract, for Keenan to provide service as Director of Facilities Services for APS on March 28, 2024.

149. The Contract was renewed for another year on May 30, 2025.

20

150.    Keenan complied with all the obligations pursuant to the Contract until Robinson prevented Keenan to do so after he returned from his FMLA leave in the December of 2024.

151.    The Board, Robinson, and Outley breached the Contract by reducing the authorities and responsibilities of Keenan in the Contract.

152.    The Board and Outley breached the Contract by keeping Keenan's reduced authority and access permanently.

153.    The Board, Robinson, and Outley breached the Contract by removing Keenan from his physical office.

154.    The Board, Robinson, and Outley breached the Contract by removing Keenan's access to both APS's real and personal property.

155.    The Board, Thompson, Carter, and Outley breached the Contract by conducting illegally motivated investigations into Keenan for APS's arms-length transactions with Baker in retaliation for Keenan filing his complaint with Autry and the May Charge in regard to Defendants' violation of Keenan's FMLA rights.

156.    The Board breached the Contract by placing Keenan on administrative leave based on an illegally motivated investigation of the Baker trade-in matter.

157.    The Board, Robinson, and Outley breached the Contract by preventing Keenan from performing his obligations under the Contract.

158.    The Board breached the Contract when they threatened and/or implied to Keenan that they may bring civil litigation and/or criminal prosecution through the prosecutor, IRS, and/or state auditor if Keenan did not resign.

159.    Defendants breached the Contract when they constructively terminated Keenan from APS prior to the Contract's renewal term was over.

21

160.    As a direct and proximate cause of Defendants' breaches, Keenan has suffered lost wages and economic benefits of his employment, in an amount to be calculated at trial and in an amount of no less than $25,000, as well as back pay, front pay, and other equitable relief, and all other legal and equitable relief the Court deems appropriate.

## X.    COUNT SIX: BREACH OF CONTRACT IN BAD FAITH

161.    Paragraphs 1 – 160 are incorporated as if fully restated herein.

162.    The Board, Robinson, and Outley materially breached the terms of the Contract by:

a.    Reducing the authorities and responsibilities of Keenan in the Contract;

b.    Removing Keenan from his physical office;

c.    Removing Keenan's access to both APS's real and personal property;

d.    Conducting illegally motivated investigations into Keenan for APS's arms-length transactions with Baker in retaliation for Keenan filing his complaint with Autry and the May Charge in regards to Defendants' violation of Keenan's FMLA rights.

e.    Placing Keenan on administrative leave based on the illegally motivated investigation of the Baker trade-in matter;

f.    Causing Keenan to unable to perform his obligations pursuant to the Contract.

g.    Threatening and/or implying to Keenan that they may bring civil litigation and/or criminal prosecution through the prosecutor, IRS, and/or state auditor if Keenan did not resign; and

h.    Constructively terminating Keenan from APS.

163. The Board, Robinson, and Outley breached the terms of the Contract in bad faith when they restructured Keenan's position, contrary to the Contract, and refusal to restore his position and obligations when a third-party investigator found that Robinson retaliated against Keenan for exercising his FMLA rights.

164. Keenan has been a faithful employee of APS since March of 2017, and his work has always been evaluated as "Very Good" or above.

165. The Board, Robinson, and Outley have no legal justification to breach the Contract.

166. Keenan complied with all the obligations pursuant to the Contract.

167. As a direct and proximate cause of Defendants' breaches in bad faith, Keenan has suffered lost wages and economic benefits of his employment, punitive damage, and attorney's fees, in an amount to be calculated at trial and in an amount of no less than $25,000, as well as front pay and other equitable relief, and all other legal and equitable relief the Court deems appropriate.

## XI.     COUNT SEVEN: DEFAMATION

168. Paragraphs 1 – 167 are incorporated as if fully restated herein.

169. The Board and/or the Defendant members of the Board made false and disparaging statements about Keenan to the media, including, but not limited to, accusing Keenan of taking "advantage of the system".

170. No other APS employees were under investigation or threatened with criminal prosecution or civil litigation for allegedly taking "advantage of the system."

171. The Board's and/or the Defendant members' statements were false and disparaging and were intended to damage Keenan's employment prospects.

172.    The Board and/or the Defendant members had actual knowledge that their statements were false.

173.    The Board and/or the Defendant members acted with reckless disregard for the truth of their statements relating to the Baker trade-in matter.

174.    The statements by the Board and/or the Defendant members were directed at potential employers of Keenan with the clear objective of persuading these employers to refrain from hiring Keenan.

175.    The statements by the Board and/or the Defendant members were intended to damage Keenan's reputation with potential employers, amongst his peers, and in the community as a whole.

176.    Keenan had multiple interviews with potential employers prior to Board and/or the Defendant members' defamatory statements.

177.    Upon information and belief, the potential employers that Keenan interviewed with declined to hire him because of the Board's and/or the Defendant members' false statements.

178.    In any event, as the communications were defamatory per se as they relate to Keenan's work ethics as an employee of APS.  Therefore, Keenan is entitled to a presumption of damages.

179.    The actions of the Board and/or the Defendant members were also wanton, willful, and malicious, entitling Keenan to punitive damages and attorney's fees.

180.    As a direct and proximate cause of Board's and/or the Defendant members' defamation, Keenan has suffered lost wages and economic benefits of potential employment, punitive damage, and attorney's fees, in an amount to be calculated at trial and in an amount of no

less than $25,000, as well as front pay and other equitable relief, and all other legal and equitable relief the Court deems appropriate.

## XII.   PRAYER FOR RELIEF

**WHEREFORE**, Steven Joseph Keenan respectfully requests the following relief:

a.   Accept jurisdiction over this matter;

b.   Declare that Defendants have violated Keenan's rights under the FMLA and Title VII of the Civil Rights Act of 1964;

c.   Reinstatement of Keenan's position, office, authority, access, supervising responsibilities, salary, benefits, and all other terms of his position as Director of Facilities Services of APS, pursuant to his Contract;

d.   Award Keenan for his past and future loss of wages and benefits, plus interest;

e.   Award of back and front pay (including benefits);

f.   Award Keenan compensatory damages for emotional pain and suffering in an amount to be determined by the jury;

g.   Award to Keenan liquidated damages incurred in connection with this action;

h.   Award to Keenan all costs and reasonable attorneys' fees incurred in connection with this action pursuant to the FMLA, Title VII, Breach in Bad Faith, and Defamation;

i.   Award to Keenan punitive damage for Breach in Bad Faith and Defamation;

j.   A public apology letter and statement from Defendants that Keenan did not using his position to benefit from the Baker transactions or in any transactions APS engaged in with a third-party; and

25

k.      Grant Keenan such additional or alternative relief as the Court deems just and

proper.

Respectfully submitted,

**RODERICK LINTON BELFANCE, LLP**

*/s/Danny Guan*
Danny Guan (0103020)
Susan K. Steinhauer (00069879)
50 S. Main Street, 10th Floor
Akron, Ohio 44308
Tele:  (330) 434-3000
Fax:  (330) 434-9220
Email: dguan@rlbllp.com
          ssteinhauer@rlbllp.com
*Attorneys for Plaintiff*

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Steven Joseph Keenan

demands a trial by jury on all issues so triable.

*/s/ Danny Guan*
Danny Guan (0103020)

26